## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JASON ORASCO,

                **Plaintiff,**

v.

                  **Case No. 25-cv-01227-SPM**

DAVID MITCHELL, and
LATOYA HUGHES,

                **Defendants.**

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

Plaintiff Jason Orasco, an inmate of the Illinois Department of Corrections (IDOC) who is currently incarcerated at Dixon Correctional Center, brings this civil action pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights that occurred while he was housed at Pinckneyville Correctional Center. The First Amended Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests money damages from a defendant who by law is immune from such relief must be dismissed. *See* 28 U.S.C. § 1915A(b).

### THE FIRST AMENDED COMPLAINT[1]

Plaintiff alleges that prior to transferring to Pinckneyville Correctional Center (Pinckneyville), he was housed in protective custody at Menard Correctional Center (Menard)

---

[1] Because it appears that Plaintiff is relying on statements made in the First Amended Complaint and attached exhibits in asserting his claims, the Court is construing the allegations in all of these pleadings together. *See Otis v. Demarass,* 886 F.3d 639, 644 (7th Cir. 2018); FED. R. CIV. P. 10(c) ("[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

after being "jumped on" by members of the gang Latin Folk. (Doc. 14, p. 7, 8). He was also "labeled as vulnerable," as he is transgender[2] and disabled. (*Id.* at p. 7, 32).

At some point, Plaintiff was transferred to Pinckneyville and housed in Unit 5B. (*Id.* at p. 6, 7). While in Unit 5B, Plaintiff states he felt safe. (*Id.* at p. 6). Plaintiff was later transferred to Unit 5D, which he describes as "an aggressive unit" that houses violent inmates. (*Id.*). Following his transfer, while in the dayroom, he alleges that he witnessed an inmate stomping on another inmate's face and that an officer did not come to help until dayroom time was over. (*Id.*). Plaintiff asserts that he feared for his safety in Unit 5D, not only because the unit housed violent inmates, but also because gangs were targeting inmates, like him, who were known to have been previously held in protective custody at Menard. (*Id.* at p. 7). Additionally, at the time, Plaintiff's co-defendant was a member of the Gaylord gang and had a "hit" out on Plaintiff. Plaintiff asserts that fellow members of the Gaylord gang were housed in Unit 5D. (*Id.*).

Plaintiff states that after being transferred to Unit 5D he wrote to internal affairs three times and once to mental health seeking a transfer because he did not feel safe in Unit 5D. (Doc. 14, p. 7, 21-22). He alleges that even his mom called IDOC in Springfield, Illinois, to express his concerns about the violence in his assigned housing unit, but Plaintiff was not moved. (*Id.*).

On June 14, 2023, Plaintiff submitted Grievance #1861-06-23 complaining that he was afraid for his safety while housed in Unit 5D. (*Id.* at p. 6, 21-22). In the grievance, he explains that he is designated as vulnerable status and should not be housed in an "aggressive wing." (*Id.* at p. 22). Plaintiff states that he overheard members of the Latin Kings and the Gaylords tell an inmate that because the inmate was in protective custody at Menard the inmate "had to go." (*Id.* at p. 22). Plaintiff writes that he is afraid the gang members will find out that he was in protective custody

---

[2] Plaintiff uses male gender pronouns when referring to himself.

at Menard and assault him. He states he also fears for his safety from a particular inmate named Casper, who is a member of the Gaylords and housed in Unit 5D. (*Id.*). He believes that Casper will hurt him if Casper finds out that Plaintiff was in protective custody at Menard and that Plaintiff's co-defendant is a member of the Gaylords. (*Id.*). Plaintiff requests a "keep separate from" order for Casper and to be moved from Unit 5D. (*Id.*). Plaintiff filed the grievance as an emergency. (*Id.* at p. 21).

Plaintiff filed another emergency grievance on June 16, 2023, Grievance #1881-06-23, because he continued to fear for his safety in Unit 5D. (Doc. 14, p. 8, 25-26). In this grievance, Plaintiff states that another gang member, named Zero, has recently moved into Unit 5D with whom Plaintiff had "issues with on previous occasions." (*Id.* at p. 8). Again, Plaintiff expresses that he does not feel safe in Unit 5D and states that inmates are attacking other inmates who have been in protective custody "or running from a gang." (*Id.* at p. 26). He states he was in protective custody after being "jumped" by members of the Latin Folks. (*Id.*). Plaintiff says he is afraid he will be attacked next, and he is specifically fearful of Zero and Casper. (*Id.*). Plaintiff asks for a keep separate from order for Casper and Zero and to be moved back to Unit 5B. (*Id.*).

In response to both grievances, a staff member of internal affairs responded that Plaintiff did not want the "Investigations Unit to Interview" the individuals mentioned in his grievances and that the individuals, who Plaintiff had identified as Casper and Zero, had been moved from Unit 5D. (Doc. 14, p. 24). The staff member notes that because Plaintiff is "a vulnerable he is properly housed on R5 D wing." (*Id.*). The grievance officer recommends that the grievances be deemed moot, and on June 23, 2023, Warden Mitchell confirmed the recommendation. (*Id.* at p. 8, 9, 23). Plaintiff appealed Grievance #1861-06-23 and Grievance #1861-06-23 to the Administrative Review Board, and the grievances were denied by IDOC Director Latoya Hughes. (*Id.* at p. 8).

On September 18, 2023, while returning from yard, another inmate punched Plaintiff in the face causing him to fall to the floor. (Doc. 14, p. 9). The inmate then started stomping on Plaintiff's head. (*Id.*). Plaintiff was taken to the healthcare unit and then to a nearby hospital. (*Id.*). Plaintiff was treated for a laceration on his right eyebrow and diagnosed with a contusion. (*Id.*). Upon his return to Pinckneyville, Plaintiff was again housed in Unit 5D. (*Id.*). A keep separate order was entered for Plaintiff and his assailant, and an investigation revealed that the inmate attacked Plaintiff because the inmate believed Plaintiff had stolen from him. (*Id.* at p. 34).

Plaintiff filed Grievance #3184-09-23 complaining about the failure by staff to protect him from the assault. (Doc. 14, p. 11). Warden Mitchell and Director Hughes denied the grievance. (*Id.* at p. 11, 30, 31). On October 3, 2023, Plaintiff submitted Grievance #3348-10-23, in which he again grieved the assault and also that he was denied the ability to press charges against his assailant. (*Id.* at p. 11, 32-33). This grievance was denied by Warden Mitchell and Director Hughes. (*Id.* at p. 11, 34, 35).

### PRELIMINARY DISMISSAL

To the extent Plaintiff is attempting to bring a claim because he was denied the ability to press charges against the inmate who attacked him on September 18, 2023, such claim is dismissed. (Doc. 14, p. 16). There is no federal right for a private citizen to pursue criminal charges against another citizen.

### DISCUSSION

Based on Plaintiff's allegations and his articulation of his claims, the Court designates the following count:

**Count 1:**   Eighth Amendment failure to protect claim against Mitchell and Hughes.

The parties and the Court will use this designation in all future pleadings and orders, unless

otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the First Amended Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly*[3] pleading standard.**

To state a claim for failure to protect, a plaintiff must first demonstrate, objectively, that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prison official must have actual knowledge of the risk to the inmate and then failed to act to prevent the harm. *Id.* The plaintiff must allege more than "a generalized risk of violence…for prisons are inherently dangerous places." *Wilson v. Ryker,* 451 F. App'x 588, 589 (7th Cir. 2011) (internal citations and quotations omitted). Instead, a plaintiff "must allege a tangible threat to his safety or well-being" and "a substantial risk of future harm." *Id.* "A substantial risk of serious harm is one in which the risk is so great that it is almost certain to materialize if nothing is done." *Id.*

Plaintiff again has failed to state a claim for failure to protect. First, Plaintiff attempts to hold Warden Mitchell and Director Hughes liable based on their receipt and review of his two emergency grievances filed in June 2023, months before he was attacked in September 2023. As this Court previously stated, mere receipt of grievances from a prisoner is usually insufficient to establish liability. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of Owens's grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."); *see also George v. Smith,* 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."). Defendants cannot be held liable simply because they reviewed and denied Plaintiff's grievances.

---

[3] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

The Court further notes that based on the grievance officer's response, it is also not plausible to infer that Mitchell or Hughes knew that there continued to be a specific threat to Plaintiff's safety. In the June 14 and 16, 2023 grievances, Plaintiff complains that he believes that Unit 5D is unsafe for him in general, but he also seeks a "keep separate order" from two individuals, Zero and Casper. In the grievance response, internal affairs reports (1) that Casper and Zero had been moved to a different housing unit; (2) that Plaintiff, as a designated vulnerable person, was appropriately housed; and (3) that Plaintiff could refuse housing if he felt unsafe. (Doc. 14, p. 24). Based on this response, and the fact that Plaintiff did not submit anymore grievances or complaints after Zero and Casper where moved, it is not plausible to infer that Mitchell and Hughes had knowledge that Plaintiff continued to be in danger of an imminent harm and responded with "callous indifference." *See Pinkston v. Madry,* 440 F. 3d 879, 889 (7th Cir. 2006) (observing that "conduct that simply amounts to 'mere negligence or inadvertence' is insufficient to justify the imposition of liability."). Thus, Plaintiff has failed to state a claim against Mitchell and Hughes because his grievances were denied without further action.

Second, Plaintiff asserts his failure to protect claim based on policy, custom, or practice. Plaintiff alleges that Warden Mitchell and Director Hughes had a policy, custom, or practice of housing vulnerable inmates with violent inmates "knowing that doing so would likely place the vulnerable inmate in an environment where they would be more likely to be assaulted." (Doc. 14, p. 10, 14, 16).

"Individual defendants…who are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." *Sinn v. Lemmon,* 911 F.3d 412, 423 (7th Cir. 2018). However, "an inmate cannot show a widespread practice of an unconstitutional nature, such as a custom of ignoring prison policy, by pointing to isolated incidents of inmate-on-inmate

Page 6 of 8

brutality." *Id. See also Lewis v. Richards,* 107 F.3d 549, 555 (7th Cir. 1997) ("But three attacks upon a single inmate are insufficient to let us classify an institution as suffering from pervasive violence.").

Other than describing his own personal experience, Plaintiff does not provide any facts to support his conclusion that he remained in Unit 5D pursuant to a prison-wide practice or policy of housing vulnerable and high aggressive inmates together and that such policy was maintained and implemented by the Defendants. *See Id.* ("an inmate cannot show a widespread practice of an unconstitutional nature, such as a custom of ignoring prison policy, by pointing to isolated incidents of inmate-on-inmate brutality"). The Court therefore cannot plausibly infer that his constitutional rights were violated pursuant to a policy or custom.

Because Plaintiff has failed to state a constitutional claim against the Defendants, the First Amended Complaint does not survive screening under 28 U.S.C. § 1915A and shall be dismissed. When a complaint fails to state a claim upon which relief may be granted, the plaintiff is ordinarily given an opportunity to amend the complaint in order to correct the deficiencies. *See* FED. R. CIV. P. 15(a). However, leave to amend need not be granted if it is clear that any amendment would be futile. *See Always Towing & Recovery, Inc. v. City of Milwaukee,* 2 F.4th 695, 707 (7th Cir. 2021); *Bogie v. Rosenberg,* 705 F.3d 603, 608 (7th Cir. 2013); *Garcia v. City of Chicago,* 24 F.3d 966, 970 (7th Cir. 1994). This is Plaintiff's second attempt to state a claim, and he again is unsuccessful. Accordingly, the Court finds that any further amendment of Plaintiff's claims in this action would be futile. The dismissal of this case will be with prejudice and without leave to amend.

### DISPOSITION

For the reasons stated above, the First Amended Complaint (Doc. 14) and this entire action are **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted. The Court considers the dismissal of this action as a "strike" under 28 U.S.C. § 1915(g).

Page 7 of 8

Plaintiff may appeal this Order by filing a notice of appeal with this Court within thirty days of the entry of judgment. FED. R. APP. P. 4(a)(1)(A). If he does choose to appeal, he will be liable for the $605.00 appellate filing fee irrespective of the outcome of the appeal. *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien,* 133 F.3d at 467. Moreover, if the appeal is found to be nonmeritorious, Plaintiff may also incur another "strike." A proper and timely motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline. Fed. R. App. P. 4(a)(4). A Rule 59(e) motion must be filed no more than twenty-eight (28) days after the entry of the judgment, and this 28-day deadline cannot be extended.

The Clerk of Court is **DIRECTED** to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: April 27, 2026**

       *s/Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**United States District Judge**